IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| REBECCA DAWN SCOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) CIV-13-1137-M |
| v. | ) |
| | ) |
| CAROLYN W. COLVIN, | ) |
|   Acting Commissioner of Social | ) |
|    Security Administration, | ) |
| | ) |
| Defendant. | ) |

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be affirmed.

I. Background

Plaintiff protectively filed her application on January 12, 2010, and alleged she became disabled on January 7, 2010, due to congestive heart failure. At that time, Plaintiff was 32 years old. She was working part-time (12 hours per week) as a trolley dispatcher, she had a ninth grade education, and she had previously worked as a bus driver, dietary aide, groundskeeper,

office assistant, and waiter.

The medical record reflects that in April 2009 Plaintiff suffered a heart attack and was treated by Dr. Shah at the Oklahoma Heart Hospital. (TR 310-313). Dr. Shah performed a cardiac catheterization which showed triple vessel cardiac disease of moderate severity. Dr. Shah successfully implanted a stent in Plaintiff's mid circumflex coronary artery. Plaintiff had an uneventful recovery and was walking at the time of her discharge on April 19, 2009. (TR 293). Plaintiff was prescribed medications to treat her heart disease.

In June 2009, Plaintiff was treated at a hospital emergency room for musculoskeletal chest pain. The examining physician noted that EKG and telemetry monitoring tests were normal, and Plaintiff was discharged. (TR 207-217).

In October 2009, Plaintiff underwent a second cardiac catheterization conducted by Dr. Shah. During this procedure a second stent was successfully implanted to repair her severe single vessel cardiac disease. Dr. Shah noted that Plaintiff's recovery was uneventful, and Plaintiff was walking at the time of her discharge. Plaintiff was prescribed medications and advised not to perform "heavy lifting" and not to drive on the day of discharge. (TR 323).

Plaintiff was treated in December 2009, January 2010, and February 2010 by Ms. Lorimor, a nurse practitioner, for her diabetes. (TR 242, 243, 246). Ms. Lorimor's office notes reflect that diabetic medications were prescribed.

In January 2010, Plaintiff sought treatment at a hospital emergency room for left arm pain. The attending physician noted a chest x-ray and EKG testing were normal and Plaintiff was discharged the following day with a diagnosis of costochrondrial pain. She was advised to

seek treatment to improve her glucose control. (TR 195-206).

In February 2010, Plaintiff returned to Dr. Shah and complained of chest pain for three days, arm pain, and fatigue. She was admitted for testing. (TR 368-371). Plaintiff's exercise tolerance test results were "negative" and "adequate" without chest pain and a myocardial perfusion imaging test was "normal." (TR 314). Dr. Shah's diagnostic assessment was unstable angina, coronary artery disease, diabetes mellitus type II, uncontrolled, hyperlipidemia, hypertension, obesity, and tobacco abuse. (TR 319). Plaintiff was discharged in "improved" condition" with "[a]ctivity restriction as before." (TR 319).

In April 2010, Plaintiff was treated by Dr. Williams at the Oklahoma Heart Hospital for chest pain "intermittently for the last couple of months" and worse the previous night. Dr. Williams noted that EKG, chest x-ray, and lab tests were all was normal. The diagnostic impression was atypical, probably musculoskeletal, chest pain. (TR 426-430). Plaintiff was discharged and advised to stop smoking and to improve control of her "poorly controlled" diabetes. (TR 429-430)l

In August 2010, Plaintiff underwent a cardiac catheterization conducted by Dr. Kerns, which Dr. Kerns noted showed triple vessel disease of moderate severity. (TR 353-356). Dr. Kerns further noted that "[d]espite copious advice to the contrary" Plaintiff was still smoking cigarettes and she had also been non-compliant with her cardiac medication. (TR 372). During the catheterization procedure, Dr. Kerns implanted three stents in Plaintiff's heart, and she was discharged home to continue her medications. (TR 373).

In November 2010, Plaintiff was treated at a hospital for left shoulder pain she reported

3

had occurred for one to two days and sharp chest pain which she reported occurred the previous day while bathing her children. (TR 338). Dr. Shah noted that EKG testing was normal, a physical examination did not show deficits, and Plaintiff was discharged the following day in no pain. (TR 339). Dr. Shah noted Plaintiff's chest pain was "atypical" and that he advised Plaintiff not to do "heavy lifting." (TR 343).

In November 2010, Plaintiff returned to Dr. Shah for follow-up treatment. Dr. Shah noted that Plaintiff denied angina and reported she had recently stopped smoking. (TR 358). EKG testing was normal, and her medications were refilled. Plaintiff reported she was walking daily for exercise and seeing Dr. Draelos for her diabetes treatment. (TR 358-361).

In December 2010, Plaintiff sought treatment from Dr. Draelos, who noted that Plaintiff's type II diabetes was under "poor" control. (TR 489). Plaintiff was not following a diet, she had no sensory loss, she denied depression, she "takes care of 3 kids at home," and she was "walking" for exercise. (TR 489-490). A physical examination was reportedly normal, and Dr. Draelos prescribeded diabetes, hypertension, and hyperlipidemia medications.

Plaintiff returned to Dr. Draelos in March 2011 for follow-up treatment. Plaintiff again reported she was "walking" for exercise and that she provided "care of 3 kids at home." Her medications were adjusted. (TR 483-484). Dr. Draelos noted Plaintiff's weight and height reflected a body mass index ("BMI") of 33.97.

Plaintiff returned to Dr. Shah in March 2011 for follow-up treatment. (347-351). Plaintiff denied angina or shortness of breath, and she reported she was walking daily for exercise. Dr. Shah noted Plaintiff had "[n]o angina but [her] lipids [were] poorly controlled,"

4

and Dr. Shah prescribed a medication to treat her hyperlipidemia. (TR 351).

Plaintiff testified at an administrative hearing conducted on May 21, 2012, before Administrative Law Judge Wampler ("ALJ"). (TR 23-33). Plaintiff testified she was thirty-four years old and she worked as a trolley dispatcher for eight years. She was diagnosed with diabetes at age 28 and she had six stents in her heart with 40 percent blockage of one artery. She testified she saw Dr. Shah every three months for cardiac treatment and Dr. Draelos every three months for treatment of her diabetes. Plaintiff stated she had numbness in her upper legs with sitting for a long period of time, and she described an average day as sweeping the floor or vacuuming the floor, doing the dishes, and helping her children get ready for school. Plaintiff stated she sometimes went grocery shopping and prepared meals with her husband, she went to the park with her children, and her sister helped her in the mornings. She had about 10 "bad days" per month with chest and left arm pain for which she usually took aspirin.

The ALJ issued a decision on August 8, 2012, finding that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 7, 2010. (TR 11). Following the agency's well-established sequential evaluation procedure, the ALJ found at step two that Plaintiff had severe impairments due to coronary artery disease, status post stenting, diabetes mellitus, hypertension, hyperlipidemia, and obesity. (TR 11). At step three, the ALJ found that these impairments or a combination of the impairments did not meet or medically equal the severity of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1.

At the fourth step, the ALJ found that Plaintiff's impairments restricted her ability to work and that she had the residual functional capacity ("RFC") to perform sedentary work except that

5

she could only occasionally stoop, bend, crouch, crawl, or climb stairs, she could never climb ropes, ladders, or scaffolds, and she must avoid unprotected heights and dangerous machinery. (TR 12). In connection with these findings, the ALJ reviewed the medical evidence and the nonmedical evidence and considered Plaintiff's credibility. For reasons stated in the decision, the ALJ determined that Plaintiff's allegations of disabling symptoms were not credible.

The ALJ determined that Plaintiff was unable to perform her past relevant work but that, given her age, education, work experience, and RFC, there were jobs available in the economy that she could perform. (TR 17). Relying on the agency's Medical-Vocational Guidelines at Rule 201.25 and Social Security Ruling ("SSR") 96-9p, the ALJ determined that the guidelines directed a finding of "not disabled" and the additional limitations placed on Plaintiff's ability to perform sedentary work would have little or no effect on the occupational base for unskilled sedentary work. Based on these findings, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. § 404.981; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

II. Standard of Review

In this case, judicial review of the final Commissioner's decision is limited to a determination of whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

III. Evaluation of Treating Doctor's Opinion

Plaintiff contends that the ALJ erred in his analysis of the medical source statement of Plaintiff's treating cardiac specialist, Dr. Shah. The record includes a Cardiac Medical Source Statement signed by Dr. Shah and dated March 31, 2012 (TR 535-538), in which the physician stated that he was treating Plaintiff every three months, that her diagnoses were coronary artery disease, diabetes mellitus, and hyperlipidemia, and that she had chest pain which was controlled with medication. Dr. Shah stated Plaintiff's symptoms were not related to stress, that she was capable of low stress work, and that her symptoms and limitations did not cause depression or anxiety. Dr. Shah estimated that Plaintiff could walk two blocks, she could stand/walk for less than 2 hours, she could sit at least 6 hours in an 8-hour work day, she needed a job that would permit her to shift positions at will from sitting, standing, or walking, and she would not need to take unscheduled breaks during a work day. However, Dr. Shah stated that she would need to elevate her legs 45 degrees with prolonged sitting. Dr. Shah also opined that Plaintiff could frequently lift up to 10 pounds, she could occasionally lift up to twenty pounds, and she could occasionally twist, stoop, crouch, climb stairs, and climb ladders. Dr. Shah stated that Plaintiff

should avoid exposure to all environmental irritants. Finally, Dr. Shah opined that Plaintiff's symptoms would interfere with her attention and concentration 20 percent of the time and she would likely be absent from work more than four days per month.

When considering the medical opinion of a disability claimant's treating physician concerning a claimant's functional abilities, the ALJ must follow a specific procedure. Generally, an ALJ must give the opinion of an acceptable treating source controlling weight if it is both well supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with other substantial evidence in the record. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting SSR 96-2p, 1996 WL 374188, at *2). Where an ALJ finds that a treating physician's opinion is not entitled to controlling weight, the ALJ must decide "whether the opinion should be rejected altogether or assigned some lesser weight." Pisciotta v. Astrue, 500 F.3d 1074, 1077 (10th Cir. 2007). "Treating source medical opinions not entitled to controlling weight 'are still entitled to deference' and must be evaluated in light of the factors in the relevant regulations, 20 C.F.R. §§ 404.1527 and 416.927." Newbold v. Colvin, 718 F.3d. 1257, 1265 (10th Cir. 2013)(quoting Watkins, 350 F.3d at 1300). An opinion that a claimant is disabled "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner.]" Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994).

In this case, the ALJ expressly considered Dr. Shah's medical source statement concerning her functional abilities and provided reasons in the decision for finding the opinion was not entitled to controlling weight but was only entitled to partial weight. The ALJ found

that the opinion was internally inconsistent, and it clearly is. Dr. Shah stated that Plaintiff's only symptom, chest pain, was controlled by medication. Dr. Shah thereafter inexplicably stated that Plaintiff would need to elevate her legs during the working day and would have excessive absences from work. As the ALJ pointed out, the opinion is also inconsistent with the other medical evidence in the record. There is no medical evidence showing Plaintiff had signs of edema or leg swelling that might be consistent with the leg elevation restriction imposed in Dr. Shah's medical source statement. Further, as the ALJ pointed out, Dr. Shah's treatment notes were inconsistent with the extreme limitations included in the medical source statement. His treatment records did not contain any indication that he had imposed long-term functional restrictions that would preclude Plaintiff from performing sedentary work. Although the ALJ incorrectly stated that Dr. Shah had determined Plaintiff would require unscheduled work breaks, the ALJ provided other, valid reasons that are well supported by the record for finding that Dr. Shah's medical opinion was entitled to "only partial weight." (TR 16). See Pisciotta, 500 F.3d at 1078 ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.")(internal quotation marks and citation omitted). No error occurred with respect to the ALJ's consideration of the medical opinion of Dr. Shah.

IV. Step Five Decision

Plaintiff contends that the ALJ erred in relying on the agency's Medical-Vocational Guidelines. "If the claimant is not considered disabled at step three, but has satisfied her burden of establishing a prima facie case of disability under steps one, two, and four, the burden shifts to the Commissioner to show the claimant has the residual functional capacity (RFC) to

9

perform other work in the national economy in view of her age, education, and work experience." Fischer-Ross v. Barnhart, 431 F.3d 729, 731 (10th Cir. 2005). "The claimant is entitled to disability benefits only if [she] is not able to perform other work." Bowen v. Yuckert, 482 U.S. 137, 142 (1987).

The Social Security Administration has adopted Medical-Vocational Guidelines, commonly known as grids, which are applied to determine whether a claimant is disabled based on his or her RFC category, age, education, and work experience. See 20 C.F.R. pt. 404, subpt. P, app. 2. In some instances, the grids can be used to satisfy the Commissioner's burden of proof at the fifth step of the sequential evaluation process.

"The grids should not be applied conclusively in a particular case, however, unless the claimant [can] perform the full range of work required of that RFC category on a daily basis and unless the claimant possesses the physical capacities to perform most of the jobs in that range." Hargis v. Sullivan, 945 F.2d at 1482, 1490 (10th Cir. 1991). If a claimant has pain or other nonexertional limitations that "interfere with the ability to work" then reliance on the grids is foreclosed, and in those circumstances the grids may be used only as a framework to determine whether sufficient jobs can be performed within the claimant's RFC. Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993).

In this case, the ALJ determined that Plaintiff's allegation of disabling pain and pain-related limitations was not entirely credible. The ALJ provided reasons for the credibility determination, and those reasons are well supported by evidence in the record. For instance, the ALJ reasoned that Plaintiff had described activities that were not consistent with her allegation

of disabling pain and limitations. Plaintiff informed her treating physicians that she cared for three children in her home and walked daily for exercise. She stated in a function report that she engaged in a variety of daily activities with some assistance from her sister and spouse, including home maintenance chores, cooking, shopping, driving, caring for her nieces, feeding her pet, visiting with others, watching television, listening to music, and paying bills. She stated that she required no assistance with personal needs.

The ALJ further reasoned that Plaintiff had not been entirely compliant with her medications, "which suggests that the symptoms may not have been as llimiting as the claimant has alleged in connection with this application." (TR 15). The record supports this reasoning. The ALJ further reasoned that the cardiac stenting procedures Plaintiff underwent were "generally successful in relieving the symptoms," another rationale that is well supported by the record.

Following the date on which she alleged she became disabled, Plaintiff sought treatment on a number of occasions for pain symptoms that were found to be "atypical," or non-cardiac, chest pain. In the most recent follow-up treatment notes in the record from Dr. Shah, the physician noted that Plaintiff was not experiencing angina pain and she was walking daily for exercise. The ALJ did not fully reject Plaintiff's allegations of cardiac-related pain symptoms. The ALJ's RFC assessment limited Plaintiff to sedentary work with additional postural and environmental restrictions. This RFC determination is supported by the record.

Although Plaintiff complains that the ALJ did not obtain vocational evidence in the step five decisionmaking process, a grid rule may be used to obviate the need for vocational

testimony "whenever a claimant can perform a substantial majority of the work in the designated RFC category." Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995)(citing cases). See Saiz v. Barnhart, 392 F.3d 397, 400 (10th Cir. 2004)(noting use of grid rule is precluded "if there is 'more than a slight impact on the individual's ability to perform the full range'" of work at that particular RFC level)(quoting SSR 96-9p, 1996 WL 3874185, at *5 (discussing erosion of sedentary occupational base)).

The ALJ determined, based on the RFC assessment and SSR 96-9p, that the additional limitations imposed upon Plaintiff's ability to perform sedentary work had little or no effect on the occupational base for sedentary work. Under these circumstances, the ALJ did not err in relying on the Medical-Vocational Guidelines as a framework for decisionmaking at step five. The purpose of the grids is to streamline the adjudication of disability decisions in circumstances such as this one, where a claimant's nonexertional limitations do not interfere with the ability to perform work at a particular exertional level. Thompson, 987 F.2d at 1488.

There is substantial evidence in the record to support the ALJ's determination that Plaintiff's pain and nonexertional limitations did not interfere with her ability to perform a substantial majority of the jobs at the unskilled sedentary level. Accordingly, the Commissioner's decision should be affirmed.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's application for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the

Clerk of this Court on or before _____August 11th_____, 2014, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this _____21st_____ day of _____July_____, 2014.

/s/ Gary M. Purcell
GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE